**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **GUADALUPE BETANCOURT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No:  SA-09-CA-856-XR** |
| | ) | |
| **FEDERATED DEPARTMENT STORES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

On this date, the Court considered Defendant Macy's West Stores, Inc.'s[1] Motion to Dismiss (docket no. 8), and the Response thereto.

**I. Background**

Plaintiff Guadalupe Betancourt, a Kansas resident, filed her original complaint against Defendant Federated Department Stores on October 20, 2009, seeking declaratory and injunctive relief, attorney's fees, litigation expenses, and costs under Title III of the Americans with Disabilities Act ("ADA").  Plaintiff is mobility impaired and uses a wheelchair.  She alleges that she visited the Macy's store ("the property"), located in Ingram Park Mall in San Antonio, Bexar County, Texas, and plans to return there in the future.  Plaintiff alleges that, when visiting the property, she encountered architectural barriers that discriminate against her on the basis of her disability and have endangered her safety.  Plaintiff contends that she has suffered and will continue to suffer injury until Defendant is compelled to make its property ADA compliant.

---

[1] Plaintiff sued Federated Department Stores, Inc., but Macy's West Stores, Inc. has answered and asserted that it was incorrectly named.  Docket no. 13.

After Plaintiff filed her Complaint, Defendant filed a motion to dismiss, arguing that the Complaint should be dismissed under Rule 12(b)(1) for lack of jurisdiction or, in the alternative, under Rule 12(b)(6) for failure to state a claim.  Specifically, Defendant asserts that Plaintiff lacks standing because she cannot demonstrate an injury in fact given that Plaintiff has failed to establish "that there is a realistic likelihood she will return to the subject property."  Defendant also asserts that Plaintiff's Complaint is mere boilerplate language that lacks sufficient factual detail to state a claim.  Defendant complains that paragraph 10 of the Complaint, which identified the alleged ADA violations, is composed of legal conclusions.  For example, though it asserts that certain parking spaces violate the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), it fails to identify the location of these spaces.  Defendant moves the Court to either dismiss the Complaint or require Plaintiff to file an Amended Complaint to address the alleged deficiencies.

In response to Defendant's motion, Plaintiff both filed a response (docket no. 11) and an Amended Complaint (docket no. 12).[2]  In the Amended Complaint, Plaintiff, individually and on behalf of all other individuals similarly situated, again seeks declaratory and injunctive relief, attorney's fees, and costs pursuant to Title III of the ADA.  She alleges that she is mobility impaired and uses a wheelchair.  ¶ 1.  Plaintiff alleges that "Defendant has floor, display, and counter plans, policies and specifications common to all stores nationally which cause each store to violate the requirements of the ADA by narrowing spaces between displays to prevent wheelchair passage and

---

[2] Rule 15 allows a plaintiff to file an amended complaint as of right within 21 days after service of a motion under Rule 12(b); otherwise, leave of court or written consent of the defendant is required.  Though Plaintiff's Amended Complaint was filed more than 21 days after service of the motion, Plaintiff sought and was granted an extension of time to respond to the motion to dismiss, and Plaintiff apparently construed that as also being an extension of the Rule 15 deadline.  In any event, if leave of Court was required, it is now granted, as the Rule 15 factors are met and Defendant has not objected to the filing of the Amended Complaint.  In fact, Defendant has answered the Amended Complaint.

by providing counters with excessive height." ¶ 3g.  In paragraph 6, Plaintiff alleges:

> Plaintiff has visited the property which forms the basis of this lawsuit and plans to return to the property to avail herself of the goods and services offered to the public at the property, and to determine whether the property has been made ADA compliant.  The Plaintiff has encountered architectural barriers at the subject property which discriminate against her on the basis of her disability and have endangered her safety.  These barriers also prevent Plaintiff from returning to the property to enjoy the goods and services available to the public.  Plaintiff is also a tester for the purpose of asserting her civil rights and monitoring, ensuring, and determining whether places of public accommodation are in compliance with the ADA.

¶ 6.  Plaintiff also alleges that she "has suffered and will continue to suffer direct and indirect injury as a result of the Defendant's discrimination until the Defendant is compelled to comply with the requirements of the ADA."  ¶ 7.  Further,

> Plaintiff has a realistic, credible, existing and continuing threat of discrimination from the Defendant's non-compliance with the ADA with respect to this property as described but not necessarily limited to the allegations in paragraph 10 of this Complaint. Plaintiff has reasonable grounds to believe that she will continue to be subjected to discrimination in violation of the ADA by the Defendant. Plaintiff desires to visit Macy's at Ingram Park Mall not only to avail herself of the goods and services available at the property but to assure herself that this property is in compliance with the ADA so that she and others similarly situated will have full and equal enjoyment of the property without fear of discrimination.

¶ 9.  In paragraph 10, Plaintiff alleges that a preliminary inspection has revealed violations with regard to parking, entrance access and path of travel, access to good and services (specifically, dressing rooms, counter height, and lack of signage), and restrooms.  ¶ 10.  Plaintiff alleges that she "and all other individuals similarly situated, have been denied access to, and have been denied the benefits of services, programs and activities of the Defendant's buildings and its facilities, and have otherwise been discriminated against and damaged by the Defendant because of the Defendant's ADA violations."  ¶ 11.  In paragraph 12, Plaintiff alleges that Macy's has discriminated by failing to correct architectural barriers, failing to reasonably modify policies and procedures, and failing

to provide auxiliary aids and services.  ¶ 12.

The Amended Complaint did not provide more factual detail than the original Complaint. Rather, it primarily added allegations intended to address Macy's assertion that Plaintiff lacks standing, including that Macy's has a policy or practice of discriminating against disabled persons who must travel long distances to visit a Macy's store.  ¶ 3.  Plaintiff alleges that "Macy's discriminates against and deprives disabled patrons of their civil rights accorded under the ADA unless such patrons have made a long term plan many months in advance to attend a particular Macy's store on a specified day" and that Macy's requires disabled patrons to visit a Macy's store multiple times "before their rights vest." ¶ 3.

Though the Amended Complaint did not provide additional factual details, Plaintiff's Response to the Motion to Dismiss, accompanied by Plaintiff's Affidavit, does.  The Affidavit states that Plaintiff has cerebral palsy, cannot walk, and must use a wheelchair, thus establishing that she has a disability for purposes of the ADA.  Plaintiff attests that she visited the Macy's property on March 29, 2009, and encountered a number of architectural barriers, which are listed and accompanied by photographs.  She states, "I plan to re-visit the Austin and San Antonio area in the summer of 2011 when I intend go back to see my family. I also intend to visit the area to further survey places of public accommodations, monitor ADA compliance and assert my civil rights." Last, she states,

I am aware that it would be a futile gesture to visit Defendant's facility unless and until it is brought into compliance with the Americans Disability Act [*sic*]. I intend to return to Defendant's property next summer for a planned family visit, but I have no desire to suffer further discrimination. Presently, I am aware that I am being denied the opportunity to visit Defendant's property and enjoy the same goods, advantages, benefits and services available to the non-disabled public. I am aware that I presently lack the civil right to visit Defendant's property free of discrimination. I do not know when the Defendant will fix its ADA violations, and

4

therefore am prevented by Defendant from making plans to visit its premises and shop again at its facility. As soon as I learn that Defendant is compliant with the ADA, and that I have the opportunity to visit the premises free of discrimination, I will visit the property.

Defendant has filed an Answer to the Amended Complaint (docket no. 13).  Therein, Macy's admits that it operates the store in Ingram Park Mall but otherwise denies Plaintiff's allegations.  In its first affirmative defense, Macy's continues to assert that Plaintiff lacks standing to bring these claims.

## II. Standard of Review

Defendant moves to dismiss pursuant to Rule 12(b)(1) based on Plaintiff's asserted lack of standing.  The Court must dismiss a cause for lack of subject matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *See Home Builders Ass'n of Mississippi, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).  In deciding a motion to dismiss pursuant to Rule 12(b)(1), the Court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, plus the Court's resolution of disputed facts.  *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009).  When a motion to dismiss is based on the lack of jurisdiction on the face of the complaint, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised – the court will consider the allegations in the plaintiff's complaint as true.  *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981).

"[T]he irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  These elements are "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the

5

injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61). Particularized means "that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. *Id.* At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561; *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

Defendant also moves to dismiss under Rule 12(b)(6) for failure to state a claim. In considering a motion to dismiss under 12(b)(6), all factual allegations from the complaint should be taken as true. *Fernandez-Montez v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Courts may look only to the pleadings in determining whether a plaintiff has adequately stated a claim; consideration of information outside the pleadings converts the motion to one for summary judgment. Fed. R. Civ. P. 12(d). To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations must be sufficient to "raise a right to relief above the speculative level." *Id.* A well-pleaded complaint can survive a motion to dismiss even if actual proof of the facts alleged is "improbable." *Id.* at 556.

### III. Analysis

**A. The ADA and Title III – overview, requirements, and remedies**

The ADA was passed in 1990 with the declared purposes of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and providing "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b).  Recognizing that people with disabilities historically faced discrimination in a number of areas, Congress included its in its findings the following: (1) "many people with physical or mental disabilities have been precluded [from fully participating in society] because of discrimination,"(2) "historically, society has tended to isolate and segregate individuals with disabilities," and (3) "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services."  42 U.S.C. § 12101(a). Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of architectural, transportation, and communication barriers . . . and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities," and asserted that "the Nation's proper goals regarding individuals with disabilities are to assure the equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals."  42 U.S.C. § 12101(a).

Title III of the ADA prohibits discrimination against persons with disabilities by places of public accommodation and services operated by private entities, including retail establishments. Section 12181 broadly pronounces the "general rule" that "[n]o individual shall be discriminated

against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). It then includes both "general" and "specific" prohibitions. The "general prohibition" against discrimination in activities provides that it shall be discriminatory to (1) subject disabled persons, on the basis of disability, "to a denial of the opportunity . . . to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity," (2) afford disabled persons, on the basis of disability, an unequal benefit to that afforded others, or (3) provide a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the disabled individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others. 42 U.S.C. § 12182(b)(1).

The "specific prohibitions" provide that, "[f]or purposes of subsection (a), discrimination includes (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability . . . unless such criteria can be shown to be necessary . . . (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate

8

that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden; (iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities; and (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A).

Though the application of Title III is broad, the remedies available to injured parties are limited.  *See* Ruth Colker, *ADA Title III: A Fragile Compromise*, 21 BERKELEY J. EMP. & LAB. L. 377 (2000) (noting that "[i]n return for a broad list of covered entities, civil rights advocates agreed to a limited set of remedies under ADA Title III.").  "Remedies available under Title III of the ADA are the same as those under Title II of the Civil Rights Acts of 1964, 42 U.S.C. § 2000, for which there is only injunctive relief."  *Frame v. City of Arlington*, 575 F.3d 432, 438 n.5 (5th Cir. 2009).[3] The Supreme Court has stated that suits under 204(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a), the provision creating a private right of action to enforce Title II of the Act, and which deals with discrimination in public accommodations, are "private in form only."  *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582 (1983).  "When a plaintiff brings an action under that Title, he cannot recover damages.  If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority."  *Id.* (citing *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 401-02 (1968)).  "It is fair to assume

---

[3]"The remedies and procedures set forth in section 2000a-3(a) of [Title 42 U.S.C.] are the remedies and procedures [Title III] provides to any person who is being subjected to discrimination . . . ."  42 U.S.C. § 12188.

that Congress had the same understanding when it enacted Title III of the ADA." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003).

Under the terms of the ADA, injunctive relief is available "to any person who is being subjected to discrimination on the basis of disability in violation of [Title III]." 42 U.S.C. § 12188(a)(1). "In the case of violations of sections 12182(b)(2)(A)(iv) [architectural barriers] . . ., injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by [Title III]." *Id.* § 12188(a)(2). Section 12188 expressly states that "[n]othing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." *Id.*

The ADA also permits enforcement by the Attorney General if there is reasonable cause to believe that there is a "pattern or practice of discrimination" or a person or group of persons has been discriminated against "and such discrimination raises an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B). However, the Attorney General has limited resources, and thus "private suits by necessity represent the main tool for ensuring compliance with Congress's intent in passing the ADA." Kelly Johnson, Note, *Testers Standing Up for Title III of the ADA*, 59 CASE W. RES. L. REV. 683, 710 (2009). As a result of both the Attorney General's limited resources and the limited remedies available to Title III plaintiffs, "most ADA suits are brought by a small number of private plaintiffs who view themselves as champions of the disabled." *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007).

**B. *Lyons* and *Lujan***

"Any person who is being subjected to discrimination based on disability in violation of"

10

Title III has a cause of action, but whether a plaintiff has a cause of action is a distinct issue from whether she has standing under Article III. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (noting the difference between having a cause of action and standing). Thus, because a federal plaintiff must demonstrate standing for each type of relief sought, and the relief available to a Title III ADA plaintiff is injunctive relief, a plaintiff must satisfy the Article III standing requirements for injunctive relief. The Supreme Court has never addressed Article III standing requirements for Title III suits. Many federal courts deciding standing issues under the ADA Title III rely primarily on *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), which involved very different factual scenarios.

In *Lyons*, the Supreme Court found that the plaintiff lacked standing to seek declaratory and injunctive relief prohibiting the City's police department from using chokeholds because of "the speculative nature of Lyons' claim of future injury." *Lyons*, 461 U.S. at 111. The Court held that a "plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 102. The Court stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects," though "[p]ast wrongs [are] evidence bearing on 'whether there is a real and immediate threat of repeated injury.'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488 (1974)). Though it stated these broad principles, the finding of no standing in *Lyons* rested on specific conclusions, including that (1) Lyons had done nothing to establish a real and immediate threat that he would again be stopped for a traffic violation or for any other offense by an officer or officers who would illegally choke him

into unconsciousness without any provocation or resistance on his part (in fact, the Court noted its holding in a prior case that it would presume that the plaintiff would behave lawfully); (2) the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate; and (3) withholding injunctive relief did not mean that the federal law would exercise no deterrent effect in the circumstances because Lyons had a damages remedy for his injury.

*Lujan* involved a challenge by environmental group plaintiffs to a regulation issued by the Secretary of the Interior that interpreted § 7 of the Endangered Species Act "in such fashion as to render it applicable only to actions within the United States or on the high seas." *Lujan*, 504 U.S. at 558. The plaintiff wildlife conservation and environmental groups sought a declaratory judgment that the regulation was erroneous and an injunction requiring the Secretary to promulgate a new regulation. *Id.* at 559. The Court emphasized at the outset of the opinion that "[w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be . . . proved in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue" and when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Id.* at 561-62. The Court held that, to survive summary judgment, the plaintiffs had to submit evidence showing through specific facts, "not only that the listed species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be 'directly' affected apart from their 'special interest' in the subject." *Id.* at 563. The Court noted that the plaintiffs had no specific future plans to go abroad and observe the

endangered species, "[a]nd the affiants' profession of an 'intent[t]' to return to the places they had visited before – where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species – is simply not enough." *Id.* at 564.  It held that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Id.*  Thus, it was "beyond the limit" and "into pure speculation" to say "that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." *Id.*

**C. Courts applying *Lyons* and *Lujan* to find no standing**

A number of courts have applied *Lyons* and *Lujan* to hold that a plaintiff lacks standing to seek injunctive relief under Title III unless she alleges a concrete, particularized, and credible plan to return to the public accommodation that is currently discriminating against her on a specific future date.  These courts hold that the likelihood of future injury is measured by "whether the plaintiff is likely to return to the defendant's business." *Access4All, Inc. v. Wintergreen Commercial*, Civ. A. No. 3:05-CV-1307, 2005 WL 2989307 at *3 (N.D. Tex. Nov. 7, 2005).  And, whether these courts find that a plaintiff is likely to return to the allegedly discriminatory business is determined by considering "such factors as: (1) the proximity of the defendant's business to the plaintiff's residence, (2) the plaintiff's past patronage of the defendant's business, (3) the definitiveness of the plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the defendant." *Id.*

**D. Commentary**

The "concrete plan to return" approach, which is espoused by Defendant in this case, has

been repeatedly criticized by commentators.  In 2000, Ruth Colker wrote that "[c]ourts that have applied *Lyons* to ADA Title III cases have applied the [standing] doctrine too stringently and have arguably misconstrued the nature of these Title III actions."  Colker, *supra* at 397.  Distinguishing *Lyons*, Colker noted that ADA Title III "cases do not involve extreme situations in which only a plaintiff's criminal conduct could cause future discrimination to occur," but instead "these are cases in which plaintiffs represent a class of litigants who repeatedly face instances of discrimination as a result of their own voluntary and lawful conduct."  *Id.*

In 2002, Elizabeth Keadle Markey noted that "[m]any courts have relied on tenuous analogies to, and narrow interpretations of, judicially-created standing doctrine in deciding whether a plaintiff has standing under the ADA" and advocated "greater vigilance on the part of the courts to ensure that persons who suffer disability discrimination do have standing to bring their claims."  Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans With Disabilities Act*, 71 Fordham L. Rev. 185, 186 (October 2002).

In 2004, Professor Adam Milani surveyed the case law, noting that "[t]he generating force for ADA compliance of private suits will be blunted . . . if courts persist in holding that plaintiffs do not have standing to remedy violations such as inaccessible buildings or the refusal to change policies regarding the provisions of services or auxiliary aids to people with disabilities."  He recognized that "[b]y their very nature, such violations are ongoing and not isolated occurrences."  Adam A. Milani, *Wheelchair Users Who Lack "Standing": Another Procedural Threshold Blocking Enforcement of Titles II and III of the ADA*, 39 Wake Forest L. Rev. 69, 113 (Spring 2004).  Professor Milani argued that allowing standing in most Title II and III cases is actually consistent with the holdings in *Lyons* and *Lujan*.  He notes that "the 'odds' of the injury recurring are certain

where a building is not in compliance with the ADA," and that the plaintiff and "every other person with the same disability" will confront the same barrier on every future visit.  *Id.*  He further argued that disabled plaintiffs need not establish imminent future injuries because "they have an actual and present injury – they are currently deterred from visiting a building."  *Id.* at 117-18.

And recently, Kelly Johnson wrote that "[c]ourts are mistaken in applying Lyons and Lujan to prevent standing to ADA testers" because "the [Supreme] Court's rationale for denying standing in the cases is inapplicable to ADA testers."  Johnson, *supra* at 712.  Discussing standing specifically in the context of ADA testers, Johnson notes that the "suit is in court because the defendant refuses to make the necessary changes, so there is little doubt a plaintiff would be subjected to the harm if he or she were to return" and "testers can plausibly claim that they will return to the place of violation, which is different from claiming that police will choke you or that you plan on traveling to a faraway country to see exotic animals."  *Id.*  She asserts that "a tester's assertions that he or she plans to return to a public accommodation are quite likely true, because the tester would probably be the first person to make sure the changes were made for compliance" and "no precedent says that a plaintiff's intent to return cannot be motivated in some way to advance his/her lawsuit."  *Id.* at 712-13.  Johnson contends that "[c]ourts that use *Lyons* and *Lujan* as grounds to deny standing are interpreting the cases to stand for principles those decisions do not endorse and are applying the cases far too stringently."  *Id.* at 714.

## E. Broader Views of Title III Injury and Standing

Other courts and judges have taken a broader approach to Article III standing for injunctive relief in Title III cases.  Criticizing the majority's finding of no standing based on the plaintiff's failure to allege a specific date in the future on which he would return to defendant's facility, Judge

Barkett wrote:

> Especially in the disability context, a "specific-date/set-plans" standard would produce patently absurd results, and would almost certainly place plaintiffs in a Catch-22 so far as their credibility is concerned.  To have standing under the ADA, is a wheelchair-bound individual who consistently but unpredictably frequents a particular Burger King required to predict the very day on which he will next crave a Whopper?

*Access v. America v. Associated Out-Door*, 188 Fed. App'x 818 at *2 (11th Cir. 2006) (Barkett, J., dissenting).  He also noted that the Eleventh Circuit had previously held that an allegation that the plaintiff would return to the public accommodation "soon" was sufficient.  *See Stevens v. Premier Cruises*, 215 F.3d 1237 (11th Cir. 2000).

Some courts have also recognized that the Title III ADA plaintiff's injury may be broader than the injury suffered by the direct interaction with architectural barriers.  Consistent with the express language of the ADA, these courts recognize that plaintiffs need not engage in the "futile gesture" of alleging an intent to return to a place before it is made ADA-compliant.

The Eighth Circuit in *Steger v. Franco*, 228 F.3d 889 (8th Cir. 2000), though applying *Lyons* and *Lujan*, nevertheless found that a plaintiff who had suffered past injury had standing to sue a building owner to compel compliance with the ADA.  The building provided office and retail space for health care providers and other retail and service establishments.  The Eighth Circuit held that the plaintiffs had to satisfy the general requirements set forth in *Lyons* and *Lujan*, including injury-in-fact and redressability.  Regarding injury-in-fact, the Court held that "[a]lthough plaintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying, see 42 U.S.C. § 12188(a)(1), they must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers." *Steger*, 228 F.3d at 892.  The Court did not require the plaintiff to allege a specific and concrete plan to

return to the building before it was made ADA-compliant.

In *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133 (9th Cir. 2002), the Ninth Circuit also recognized that the deterrent effect of discriminatory conditions is an ongoing injury sufficient to confer standing.  The court held that, "under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury," and "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues." *Id.* at 1136-37.  Accordingly, allegations that "[the plaintiff] has visited [defendant's] store in the past and states that he has actual knowledge of the barriers to access at that store" and that plaintiff "prefers to shop at Holiday markets and that he would shop at the Paradise market if it were accessible" were sufficient to establish actual or imminent injury for purposes of standing.  *Id.* at 1138.

The Ninth Circuit reaffirmed this position in subsequent cases, noting that "[t]he Supreme Court has instructed us to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Doran v. 7-Eleven*, 524 F.3d 1034, 1039 (9th Cir. 2008).

The First Circuit found a plaintiff's allegations similar to the allegations in this case to be sufficient to confer standing at the pleading stage in *Disabled Americans for Equal Access, Inc. v. Ferries Del Caribe, Inc.*, 405 F.3d 60, 64 (1st Cir. 2005).  The plaintiff alleged that he had visited defendant's cruise ship and been subjected to discrimination, that he intended to return to the cruise vessel to avail himself of the goods and services thereon, and that the barriers had denied and diminished his ability to visit and/or use the property and had endangered his safety and the safety

17

of other disabled persons.  *Id.* at 65.  The court expressly held that the plaintiff did not have to engage in the futile gesture of actually traveling aboard the vessel again to establish standing.  *Id.* at 65 n.7.

## F.  Fifth Circuit decisions

The Fifth Circuit has not expressly considered the proper approach to determining standing in the typical Title III case.  In fact, this Court has located only one published Fifth Circuit case discussing standing in a Title III case – *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308 (5th Cir. 1997).  In *Plumley*, the standing issue was not a difficult one given that the plaintiff had died, rendering any continuing or future injury impossible.  In that case, Plumley's son arranged to buy a used truck from the defendant, Landmark Chevrolet, and Plumley was to act as guarantor.  When the sales person/manager learned that Plumley was HIV+, he refused to sell the car to Plumley's son.  Plumley thereafter died and his wife was substituted as the plaintiff, and Plumley's son bought a truck elsewhere.  The Fifth Circuit dismissed the ADA claim, reasoning:

> [A] plaintiff seeking injunctive relief based on an alleged past wrong must show that there is a real or immediate threat that he will be wronged again. Appellant cannot meet this threshold. Plumley has died and his son bought another truck. It is unlikely that Landmark will wrong Plumley again.

*Plumley*, 122 F.3d at 312.

However, in the more typical situation in which the plaintiff remained alive and a discriminatory policy remained in place, the Fifth Circuit affirmed the district court's order for injunctive relief concerning a brewery's policy on service animals.  *Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997).  Recognizing that the policy against allowing service dogs on the brewery tour affected more than just the plaintiff in that case, the district court issued an injunction requiring the brewery to ensure that "disabled persons with guide

18

dogs or other service animals have the broadest feasible access to the public tour." The Fifth Circuit affirmed without raising the issue of standing or requiring the plaintiff in that case to allege an intent to return.[4]

The Fifth Circuit has also issued two unpublished cases discussing standing in Title III cases. In *Bynum v. American Airlines*, 166 Fed. App'x 730 (5th Cir. 2006), the Court indicated that a disabled plaintiff had standing to sue airlines on which he had flown, without requiring proof that he would be wronged by these airlines again on a specific date. In *Jolly v. Pappas Restaurant, Inc*., 189 F.3d 467 (5th Cir. 1999), the plaintiff was allegedly denied service at the defendant's restaurant. The Fifth Circuit stated that the fact that the defendant restaurant had denied the plaintiff service in the past was an insufficient basis for injunctive relief, and that the plaintiff must show a real or immediate threat that he would be wronged again. The Court found that he could not do so, however, because the defendant restaurant had indicated that the plaintiff was welcome at his restaurant. The case did not involve any ongoing architectural barriers.[5]

---

[4] The Court notes that, requiring a plaintiff to allege an intent to return to such a tour, which persons generally visit only once, would likely render the ADA wholly ineffective with regard to such types of destinations. As the courts recognized in *Johnson*, injunctive relief was appropriate to remedy the discrimination for all similarly situated individuals.

[5] Though the Fifth Circuit has applied *Lyons* in the Title I context to require an employment plaintiff to allege a likelihood that he would be subjected to a similar violation in the future, its facts are distinguishable. In *Armstrong v. Turner Industries, Inc*., 141 F.3d 554 (5th Cir. 1998), the plaintiff, who was not disabled, sought to challenge a violation of section 12112(d)(2)(A), which provides that a covered entity shall not conduct a medical examination or make inquiries of a job applicant concerning their disability until a conditional offer of employment has been extended. The Court held that, because the plaintiff did not indicate that he planned to seek employment with the company again, nor did he "purport to represent a specific class of individuals that is in danger of discrimination from [defendant]," he lacked standing. *Id.* at 563. Persons who are disabled, however, do represent a specific class of individuals in danger of discrimination by the defendant when the defendant violates Title III. Further, in Title III cases, so long as the plaintiff remains disabled and the barrier remains in place, the discrimination is ongoing.

**G. Synthesis – Defining Injury Under Title III of the ADA**

Modern Supreme Court jurisprudence on standing requires an "injury in fact." It is settled law that "[w]here federal statutory rights are at issue . . . Congress has considerable authority to shape the assessment of standing." *Kyles v. J.K. Guardian Security Servs.*, 222 F.3d 289, 294 (7th Cir. 2000). "[A]lthough it may not lower the threshold for standing below the minimum requirements imposed by the Constitution, Congress can extend standing to the outermost limits of Article III." *Id.* (citation omitted). Further, Congress has the power to "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Id.* (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)). Thus, "whether a person has Article III standing to sue under [a particular statute] depends in great measure on the particular rights conferred by th[at] statute[]." *Id.* It follows that whether a plaintiff has suffered an injury in fact sufficient to confer standing under Title III is determined largely by the rights conferred by the ADA.

In the case of architectural barriers, courts finding a lack of standing unless the plaintiff alleges or proves a concrete plan to return to an establishment to suffer discrimination view the Title III injury as being limited to the plaintiff's actual interactions with the discriminatory barriers at the establishment. While this is undoubtedly an injury under Title III, it is not the only type of injury, and therefore not the only type of discrimination, prohibited by Title III. Rather, the ADA expressly contemplates loss of opportunity as an actionable injury. Congress included within the Act the stated goal of assuring "equality of opportunity" to disabled persons  42 U.S.C. § 12101(a). The ADA provides a cause of action to "any person who is being subjected to discrimination" and expressly states that "it shall be discriminatory to subject an individual . . . on the basis of disability

20

. . . *to a denial of the opportunity* of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a), (b) (emphasis added). A disabled plaintiff may be denied the opportunity to participate in or benefit from the goods and services, which is among the ADA's general prohibitions, in a number of ways, including a defendant's "failure to remove architectural barriers," which is among the specific prohibitions listed in § 12182(b). Thus, the disabled plaintiff suffers an ongoing injury so long as she is effectively denied the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity. That Congress meant to restore disabled plaintiffs' choice and opportunity to visit an establishment on equal footing with the able bodied is further evident in the title of Chapter 126 – "Equal Opportunity for Individuals with Disabilities."

Recognizing this, some courts (as noted previously) have appropriately held that the Title III injury includes the deterrent effect that architectural barriers or other Title III violations have on the plaintiff. While a flight of stairs at a store's entrance is an obvious deterrent to a person in a wheelchair, less-obvious barriers also deter disabled patrons from vising an establishment. For example, a wheelchair user may reasonably avoid going to a restaurant or bar she would otherwise visit because it lacks an accessible bathroom, or may avoid shopping at a store if the aisles are too narrow to navigate. The fact that the disabled person is being deterred from visiting an establishment they would otherwise visit, even if infrequently, is an ongoing, present injury. Thus, a plaintiff need not engage in the futile gesture of visiting an accommodation she knows to be discriminating against her in order to establish standing.

Viewing the injury as the denial of opportunity to participate in or benefit from the goods,

services, facilities, privileges, advantages, or accommodations of an entity, whether caused by direct interaction with physical barriers or their resulting deterrent effect, is not only consistent with the plain language of the ADA, it is consistent with Supreme Court precedent. Thus, the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624 (1998), never suggested that the plaintiff, who had been denied dental treatment due to her HIV status, had to allege an intent to return to Dr. Abbott on a specific date to obtain relief under Title III. If it believed standing to be a problem, it had an obligation to raise the issue *sua sponte* to assure itself of the litigant's Article III standing. *DaimlerChrysler v. Cuno*, 547 U.S. 332, 340 (2006); *United States v. Hays*, 515 U.S. 737, 742 (1995). One commentator has pointed out that, following some courts' narrow approach to standing, the plaintiff in *Bragdon* would have had to wait until the litigation was resolved to get her cavity filled and refuse to see another dentist to ensure that she maintained standing. Markey, *supra*, at 185. This is surely not what Congress intended in passing the ADA. Moreover, whether Bragdon had her cavity filled or not, Dr. Abbott would have been continuing to discriminate against her through his policy of refusing certain treatments to HIV+ patients, including plaintiff, and this ongoing discrimination would be sufficient for injunctive relief.

Other Supreme Court cases also support a broader view of injury under Title III. In *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656 (1993), the Supreme Court held that the injury in fact in an equal protection case "is the denial of equal treatment resulting from the imposition of the barrier" or "the inability to compete on an equal footing." *Id.* at 666. Thus, a party challenging a set-aside program in government contracting "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.*

More recently, in *Gratz v. Bollinger*, 539 U.S. 244 (2003), the Supreme Court expressly reaffirmed this holding.  *Id.* at 263.  The Court then applied that holding to the equal protection challenge against the University's use of race in undergraduate admissions, noting that the plaintiff's allegations "that the University had denied him the opportunity to compete for admission on an equal basis" and that "[a]fter being denied admission, [the plaintiff] demonstrated that he was 'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions" were sufficient to confer standing to seek prospective relief with respect to the University's continued use of race in undergraduate admissions.  *Id.*

Further, the Supreme Court recognized deterrence as an injury in fact sufficient to confer standing for prospective relief in *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167 (2000).  The Court held that allegations that plaintiffs would like to fish, camp, swim, and picnic in and near a river downstream from the defendant's facility alleged to be polluting, but that they would not do so because they were concerned that the water was polluted by the facility's discharge adequately documented injury in fact sufficient to obtain injunctive relief.  The Court found that such conditional statements – that plaintiffs would use the river if the defendant were not discharging pollutants into it – could not be equated with the speculative "some day" intentions to visit endangered species halfway around the world that was held insufficient in *Lujan*.  *Id.* at 184. Further, the Court dismissed the dissent's reliance on *Lyons*, noting that in *Lyons* it was speculation whether the recurrence of the chokehold "would even *take place*," while it was "undisputed that Laidlaw's unlawful conduct - discharging pollutants in excess of permit limits - was occurring at the time the complaint was filed."  *Id.* (emphasis in original).  It continued, "Under *Lyons*, then, the only 'subjective' issue here is '[t]he reasonableness of [the] fear' that led the affiants to respond to

that concededly ongoing conduct by refraining from use of the North Tyger River and surrounding areas." *Id.* The Court found "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that water-way and would subject them to other economic and aesthetic harms"; instead, that proposition was "entirely reasonable" and, found to be true by the district court, was "enough for injury in fact." *Id.* at 184-85.[6]

Thus, following the reasoning of these precedents, in an ADA Title III case, the risk of injury in fact is not speculative so long as the alleged discriminatory barriers remain in place, the plaintiff remains disabled, and the plaintiff is "able and ready" to visit the facility once it is made compliant. If the disabled plaintiff returns to the location, the same discrimination will occur until the facility is made compliant. Thus, any disabled plaintiff who alleges an intent to return can demonstrate a non-speculative injury sufficient for injunctive relief under the ADA. Further, just as the *Laidlaw* plaintiffs were reasonably deterred from visiting the river due to the pollution, it is not improbable, but "entirely reasonable" that a plaintiff would be deterred from visiting a public accommodation that is currently discriminating against her. Thus, any disabled plaintiff who alleges that she is being denied the opportunity to visit or is currently being deterred from visiting a public accommodation

---

[6] In *Lujan*, the Court emphasized that the plaintiffs had not suffered any harm, that the party seeking review must himself have suffered an injury, and that "it is clear that in suits against the Government, at least, the concrete injury requirement must remain." *Lujan*, 504 U.S. at 578. ADA Title III suits are not suits against the Government, rendering those concerns inapplicable. Further, in his concurring opinion, Justice Kennedy noted that, in exercising its power to define injuries that will give rise to a cause of action where none previously existed, "Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." *Id.* at 580 (Kennedy, J., concurring). Congress has done so with the ADA, and concerns about "preserving the adversarial process by assuring that both parties before the court have an actual, as opposed to professed, stake in the outcome" are satisfied. *Id.* Further, unlike in *Lujan*, denying standing in Title III cases does result in the Act's having no deterrent effect, since injunctive relief is the sole available remedy.

that is violating Title III alleges sufficient present injury in fact for prospective equitable relief.  *See*

*Dean v. Ashing*, 409 F.2d 754, 756 (5th Cir. 1969) (in suit under Title II of the Civil Rights Act by

black trailer owners against trailer park operators who refused to rent spaces on account of race,

holding that district court "should determine whether the defendants had a policy or practice of not

renting space to Negroes" and "[i]f so, and it also appears that any plaintiff was aggrieved by this

policy or practice, then the injunction contemplated by the statute, 42 U.S.C.A. § 2000a-3(a), should

issue").

Last, the fact that a disabled plaintiff in a Title III case is a tester does not change the analysis

or outcome. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) (holding that a tester who

suffered injury in the form the statute was intended to guard against had standing and "[t]hat the

tester may have approached the real estate agent fully expecting that he would receive false

information, and without any intention of buying or renting a home, does not negate the simple fact

of injury within the meaning of [the statute].").  In *Evers v. Dwyer*, 358 U.S. 202 (1958), the

Supreme Court reversed the lower court's dismissal of a case for lack of an actual "case or

controversy" in the civil rights context.  Plaintiff, who was black, sat in the front of the Memphis

public bus, and was ordered to move to the rear.  After being threatened with arrest if he refused to

comply, the plaintiff left the bus.  In finding that an actual "case or controversy" existed, the Court

reasoned:

> We do not believe that appellant, in order to demonstrate the existence of an 'actual
> controversy' over the validity of the statute here challenged, was bound to continue
> to ride the Memphis buses at the risk of arrest if he refused to seat himself in the
> space in such vehicles assigned to colored passengers. A resident of a municipality
> who cannot use transportation facilities therein without being subjected by statute to
> special disabilities necessarily has, we think, a substantial, immediate, and real
> interest in the validity of the statute which imposes the disability. *That the appellant
> may have boarded this particular bus for the purpose of instituting this litigation is*

*not significant.*

*Id.* at 204 (emphasis added).  Thus, a disabled tester who experiences the discrimination prohibited

by the ADA has standing to seek relief.  *See Tandy v. City of Wichita*, 380 F.3d 1277, 1287 (10th

Cir. 2004) (recognizing tester standing to seek injunctive relief under Title II related to City's bus

system).

**H.  Application**

The allegations of the Complaint/Amended Complaint establish that Plaintiff has visited the

Macy's store at issue and that she encountered ADA violations in the form of architectural barriers

that discriminated against her by interfering with her use and enjoyment of Macy's goods and

services and by endangering her safety.  It is undisputed that the alleged barriers existed at the time

Plaintiff filed her Complaint.  Further, Plaintiff alleges that she plans to return to the property to

avail herself of the available goods and services and to determine whether it has been made ADA

compliant.  These undisputed allegations are sufficient to establish standing at the pleading stage.

Further, the Court has also considered the undisputed statements in Plaintiff's Affidavit, which

asserts that Plaintiff plans to return to the Macy's in the Summer of 2011, but that she does not

desire to suffer the same discrimination, and that she is being denied the opportunity to visit the store

free from the discrimination prohibited by the ADA.  The Amended Complaint, together with the

undisputed assertions in the Affidavit, also establish that Plaintiff has standing to assert her claims

with regard to architectural barriers.

**I. 12(b)(6) Motion**

Defendant argues that, even if Plaintiff has standing, her Complaint fails to state a claim

upon which relief can be granted because it contains only conclusory, formulaic allegations.  With

regard to architectural barriers, Plaintiff states a claim for relief.  She alleges that she is disabled (specifically, mobility impaired), that defendant is covered by Title III, that she visited the property and encountered specifically enumerated architectural barriers, and that she was discriminated against on the basis of her disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of Defendant's facility.   Additional specificity concerning the architectural barriers can be obtained during discovery.  Further, Plaintiff's Affidavit provides additional factual detail.

However, Plaintiff fails to state a claim with regard to an alleged failure to make reasonable modifications in policies, practices, or procedures or the alleged absence of auxiliary aids and services.   Auxiliary aids and services are generally things such as interpreters, note-takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices or systems, telephone compatible with hearing aids, closed caption decoders, open and closed captioning, TDDs, and videotext displays.  28 C.F.R. § 36.303.  Plaintiff has not alleged any auxiliary aid or service that she required but was not provided.  Nor has she alleged the existence of a policy, that she requested a modification of such policy, that the requested modification was reasonable, or that it was denied.  *See Johnson*, 116 F.3d at 1059.[7]  Accordingly, Plaintiff fails to state a claim with regard to these violations.

---

[7] If a policy is simply not to make required architectural modifications, that would fall under § 12182(b)(2)(A)(iv).  Further, to the extent Plaintiff's Amended Complaint alleges that Macy's discriminates against disabled persons "by requiring that they visit a particular, specified store multiple times before their rights vest" and that Defendant discourages disabled patrons from visiting any but the closest store owned by Macy's, the Court finds that Macy's decision to challenge certain plaintiffs on the basis of standing is a legal position, and is not, in and of itself, a discriminatory policy or separate ADA violation.

**Conclusion**

Defendant Macy's Motion to Dismiss (docket no. 8) is GRANTED IN PART and DENIED IN PART.

Defendant's motion to dismiss under Rule 12(b)(1) for lack of jurisdiction is DENIED.

Defendant's motion to dismiss under Rule 12(b)(6) for failure to state a claim is GRANTED IN PART and DENIED IN PART.  Plaintiff fails to state a claim with regard to alleged violations of 42 U.S.C. § 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices, or procedures) and (iii) (absence of auxiliary aids and services), but does state a claim under 42 U.S.C. § 12182(b)(2)(A)(iv), (v) (regarding architectural barriers).

It is so ORDERED.

SIGNED this 10th day of August, 2010.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE